(C.D. 2508)

BAILEY-MORA CO., INC., A/C VERA LOU, INC., ET AL. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 1, 1965)

*Stein & Shostak* (*Marjorie M. Shostak* of counsel) for the plaintiffs.
*John W. Douglas*, Assistant Attorney General (*Richard E. FitzGibbon* and *Morris Braverman*, trial attorneys), for the defendant.
*Allerton deC. Tompkins* as *amicus curiae*.

Before LAWRENCE, RAO, and FORD, Judges

FORD, Judge: The suits listed in schedule "A," annexed hereto and made a part hereof, are directed against the classification of the collector of customs at El Paso, Tex., of certain palm leaf hats, imported from Mexico. Duty was assessed under the provisions of paragraph 1504(b)(3) of the Tariff Act of 1930, as modified by the Sixth Protocol of Supplementary Concessions to the General Agreement on Tariffs and Trade, 91 Treas. Dec. 150, T.D. 54108, at the rate of 11 per centum ad valorem and $2.16 per dozen on all entries made prior to June 30, 1958, and at 10½ per centum ad valorem, plus $2.04 per dozen, for those entries made subsequent to June 30, 1958, as hats, blocked or trimmed.

Plaintiffs contend said merchandise to be harvest hats, blocked, valued at less than $3 per dozen, and as such subject to duty at the rate of 25 per centum ad valorem, under the provisions of paragraph 1504 (b) (5) of the Tariff Act of 1930.

Plaintiffs further claim that, at or prior to the time of entry, there was an established uniform practice in classifying the imported merchandise as blocked harvest hats and, accordingly, published notice of change of practice was required but not given under section 315(d) of the Tariff Act of 1930, as amended, and section 16.10(a) of the Customs Regulations of 1954, as amended.

The pertinent portions of the statutes involved herein read as follows:

Paragraph 1504(b) (3) of the Tariff Act of 1930, as modified by T.D. 54108, *supra:*

| | Rate prior to June 30, 1958 | Rate subsequent to June 30, 1958 |
|---|---|---|
| (b) Hats, bonnets, and hoods, composed wholly or in chief value of * * * palm leaf, * * *, whether wholly or partly manufactured: | | |
| * * * * * * * | | |
| (3) Blocked or trimmed, whether or not bleached, dyed, colored, or stained (except men's Yeddo hats wholly or in chief value ، of unsplit straw, blocked but not trimmed). | $2.16 per doz. and 11% ad val. | $2.04 per doz. and 10½% ad val. |

Paragraph 1504(b) (5) of the Tariff Act of 1930:

(b) Hats, bonnets, and hoods, composed wholly or in chief value of * * * palm leaf, * * *, whether wholly or partly manufactured:

* * * * * * *

(5) any of the foregoing known as harvest hats, valued at less than $3 per dozen, 25 per centum ad valorem.

The record herein consists of the testimony of four witnesses called on behalf of plaintiffs and five witnesses called on behalf of the defendant. One of the witnesses, Mr. Frank Pellegrino, was also called as an adverse witness by plaintiffs for rebuttal testimony. In addition to the testimony, there was received in evidence on behalf of plaintiffs exhibits marked Nos. 1 through 24, and exhibits A through E on behalf of defendant. Plaintiffs' exhibits 1 through 10 and 12–A through 14 represent the imported merchandise.

At the initial hearing at Los Angeles, it was stipulated by and between counsel for the respective parties that the hats at issue are valued at under $3 per dozen.

The record herein is voluminous, but it is deemed pertinent that certain portions of the testimony of the witnesses be reviewed for the purpose of this decision. Mr. Louis P. Turner, president of the importing company, who has been familiar with hats since 1946, identified samples of the imported merchandise which were received in evidence as plaintiff's exhibits 1 through 10 and 12-A through 14. Illustrative exhibits 15 through 20 were also identified by the witness as representing various hats and bodies for hats not at issue herein. The witness testified that the imported hats, such as plaintiffs' exhibits 1 through 10 and 12-A through 14, were, in his opinion, palm leaf harvest hats, and he had seen such hats being utilized in the fields by workers in various parts of the country; that, with respect to the illustrative exhibits, the witness testified that illustrative exhibit 15 represents an unblocked harvest hat in the original woven form, which is the initial stage in the manufacture of exhibit 4; that exhibit 16 represents an unblocked hat body of the type used in making hats, such as plaintiffs' exhibit 6; that plaintiffs' illustrative exhibit 17 is a harvest hat, unblocked, illustrative of the initial stage of hats, such as exhibits 3 and 10; that exhibit 18 is an unblocked harvest hat which is representative of the first stage of hats completed in the form of exhibits 7, 8, and 14; that illustrative exhibit 20 is an unblocked harvest hat in the first stage of a hat which is completed into hats, such as collective illustrative exhibit 19.

The witness Turner then testified that the price would determine the use of said hats as harvest hats more than the style, shape, or block; that any hat that is low enough in price and offers protection for the head can be sold to a field worker for harvest or other use; that if a hat is high in price, this eliminates its use as a harvest hat, regardless of the style, shape, or block, since it gets out of the price reach of the worker.

The next witness called upon by the plaintiffs, Mr. Adolfo Loera, an examiner at the port of El Paso, Tex., where the involved merchandise was entered, testified that he has been an examiner at El Paso since 1945 and had been in the customs service at El Paso since 1938; that, prior to that time, he was employed by United Dry Goods, Inc., for approximately 6 years, 2 of which were as assistant buyer, and that, as assistant buyer, he dealt with hats which were advertised as harvest hats. The witness, who appears to be well qualified, testified that, in the course of his work, he had seen and examined merchandise such as is represented by the plaintiffs' illustrative exhibits 15, 16, 17, and 18, which were advisorily classified by him as palm leaf harvest hats, not blocked, trimmed, or sewed, and on which duty was assessed at the rate of $6\frac{1}{4}$ per centum ad valorem under the provisions of paragraph 1504 (b) (5) ; that plaintiffs' collective illustrative exhibit 19 had been advisorily classified by him as palm leaf harvest

hats, blocked and trimmed, under paragraph 1504(b)(5) ; that plaintiffs' illustrative exhibit 20 was advisorily classified by him as palm leaf harvest hats, not blocked, trimmed, or sewed; that plaintiffs' illustrative exhibits 22 through 24 were advisorily classified by him as harvest hats, blocked, under paragraph 1504(b)(5).

The next witness called on behalf of plaintiffs was Mr. Chester K. Stoner, an importer since 1949. Mr. Stoner testified that, based upon his experience in dealing with hats, he has become familiar with what is known as a harvest hat; that, in his opinion, the shape or block of the hat does not determine whether it is a harvest hat; that all of the exhibits representing the imported merchandise with which he is familiar are harvest hats; that he observed them being used as such in various sections of the United States; that he is not familiar with all of the styles and, accordingly, eliminated the inclusion within this category of hats such as those represented by plaintiffs' exhibits 1, 2, 4, 5, 8, and 10, with which he has had no experience.

Mr. Frank Pellegrino, president of the International Hat Co., was called on behalf of defendant. Mr. Pellegrino testified that he had been connected with the sale of hats since 1929 but started working in the field in 1917; that he is quite familiar with harvest hats; that, in his opinion, a harvest hat is one that is low in price, made to retail for from 39 cents to 98 cents, is durable and suitable for farm and agricultural work, has a brim big enough and a crown high enough for sunshade; that, in men's hats, the brim is approximately 3 inches wide and the crown approximately 4 inches or higher; that, in ladies' hats, the brim should be approximately 4 inches wide or wider and the crown approximately 4 inches high with trimmings that should be functional; that a boy's hat must have a crown approximately 3 inches and a brim of 2½ inches or more. Defendant's exhibits A–1 through A–7 were received in evidence after being identified by Mr. Pellegrino as women's harvest hats made by his company from Mexican hat bodies. The witness also identified as a man's harvest hat an article which was received in evidence as defendant's exhibit B, as well as a descriptive folder representing various shapes of men's straw harvest hats which was received in evidence as defendant's exhibit C.

The witness was of the opinion that hats, such as plaintiffs' exhibits 1 through 10 and 12–A through 14, are novelty, carnival, fun, or sport hats rather than work hats; that they do not conform to his size specifications because the crown is lower than a minimum height and the brims are too small; that exhibits 7, 9, 13, and 14 are welted brims which would, in his opinion, based upon his experience, rule them out of being harvest hats, since the cost of welting is $1.50 per dozen. However, the witness admitted, on cross-examination, that he did not know the cost of welting on an imported hat; that exhibits 3, 8, and

10 have unfinished edges which would rule these exhibits out of the category of harvest hats; that exhibit 12–A is not a harvest hat, because of the blocked ribbon trimming which is not functional and would be too expensive to be sold as a harvest hat; that exhibits 1 through 10 and 12–A through 14 are shapes not conventional to harvest hats; that he has never sold hats, such as exhibits 1 through 10 and 12–A through 14, in the condition of the exhibits before the court; that his company imports articles such as plaintiffs' illustrative exhibits 16, 17, 18, and 20, which, in his opinion, are unblocked harvest hats.

Mr. E. J. Banstetter, treasurer of Langenberg Hat Co., was next called to testify on behalf of the defendant. Mr. Banstetter testified that he has been directly concerned with the sale of his company's hats for the past 12 or 13 years; that he is familiar with said harvest hats that are being used throughout the various areas of the United States and has personally observed their use; that a harvest hat, in his opinion, must meet certain general specifications, such as, it must be low in price, retailing at from 49 cents to 98 cents, be made of a durable material that can be worn in the field, and have dimensions that would protect the wearer from the sun and rain; that a man's hat should have a minimum brim of 3 inches and a crown of 4 to 5 inches; that a lady's hat should have a little wider brim, possibly 4 inches or more, with a crown of 4 to 5 inches; that a child's hat should have a minimum of a 2½-inch brim and a 3½-inch crown; that the decorations should be functional; that a harvest hat is not only used in harvesting crops, but is one that is worn around the farm for general agricultural purposes.

The witness then testified that, in his opinion, exhibits 1 to 10 and 12–A to 14 are not harvest hats because they do not meet the specifications of either brim size or height of the crown or the manner in which the brim is finished; that exhibit 3, because of its untrimmed ends, would be an impediment to the worker; that exihibit 12–A, by virtue of its decoration, is not a harvest hat; that exhibits 1 to 10 and 12–A to 14 are not in the shape known to him as a harvest hat; that, with the exception of exhibit 2, plaintiffs' company manufactures hats similar to those covered by the importations at bar and are sold by his company as novelty hats for use on the beach or at resorts; that his company has not, however, sold hats, such as plaintiffs' exhibits 1 to 10 or 12–A to 14, in the condition as imported; that his company either paints or puts ribbons or handkerchiefs on the hats.

Mr. Banstetter further testified that his company imports hat bodies such as exhibits 15, 16, 17, 18, and 20; that he did not consider plaintiffs' exhibits 19, 23, and 24 to be harvest hats; that, although exhibits 23 and 24 meet the crown and brim specifications, he did not consider them to be harvest hats because of the decorations; that he has never

tried to sell any hats of the shapes of plaintiffs' exhibits 1 through 10 or 12–A through 14 as harvest hats; that his company may finish articles such as plaintiffs' exhibits 15 and 16 into a child's harvest hat; that, from bodies like plaintiffs' illustrative exhibit 20, his company does make harvest hats; that exhibits 7, 8, 9, 10, 13, and 14 have welted edges which he considered to be a decoration; that there is an extra cost involved in welting a hat in his factory.

Mr. Glenn E. Holmes, vice president of Texas Hat Co., was next called on behalf of defendant. Mr. Holmes testified that his experience in the field of harvest hats goes back 45 years; that he is familiar with harvest hats and has seen them used in every stage and that, in his opinion, a harvest hat is one used for the protection of a field worker and it must be low in price, which is a very essential characteristic of a harvest hat; that it must be made out of durable material and stand the rough usage that it gets; that a man's hat should have a brim of no less than 3 inches up to $5\frac{1}{2}$ to 6 inches; that the brim of a woman's hat must be from 4 inches and up; that the crown of a man's hat and a woman's hat should be approximately no less than 4 inches, and the trimmings must be functional; that merchandise, such as plaintiffs' exhibits 1 to 10 and 12–A through 14, is not harvest hats because of the shape; that exhibit 7 is not a harvest hat because of the width of the brim and height of the crown and because it has a welted edge which is expensive. Similarly, exhibits 8, 9, 13, and 14 have a welted edge. The witness testified he had never sold hats like plaintiffs' exhibits 1 through 10 or 12–A through 14 in the condition before the court.

The witness, on cross-examination, testified that items M 58 C and M 52 C, illustrated on page 1 of defendant's exhibit C, are harvest hats in shape but are not harvest hats because of the material used in making them; and the price precluded them from being sold as harvest hats; that his company does not import any hats with welted edges and, therefore, does not know the cost of making a welted edge in Mexico.

The next witness called on behalf of the defendant was Mr. Wallace F. Minkoff, vice president of Caradine Hat Co. The witness testified that he has been familiar with harvest hats since 1948 and that, in his opinion, harvest hats must be cheap, made to retail at 29 cents to 98 cents; that they are designed to be worn in the field or for general farm use, and they must be durable; a man's harvest hat must have a brim of at least $3\frac{1}{2}$ inches and the crown must be 4 or 5 inches in height; that a lady's hat must have a brim of not less than 4 inches and a crown of 4 to 5 inches and that trimmings must be functional; that, in his opinion, plaintiffs' exhibits 1 through 10 and 12–A through 14 are not harvest hats, and his reasons would be the same as those given by Messrs. Pellegrino, Banstetter, and Holmes; that his company

does not sell articles such as exhibits 1 through 10 and 12–A through 14 in the condition in which they appear before the court; that his company imports unfinished woven palm leaf harvest hats, with bodies such as exhibits 15, 16, 17, 18, and 20; that he has seen harvest hats used in 10 states in the middle west area; that a child's harvest hat must have a brim of $2\frac{1}{8}$ inches to $2\frac{1}{2}$ inches.

Miss Vera E. Loree, vice president of the importing company, testified that she has dealt in hats since 1946 and traveled throughout the United States, with the exception of the States of Pennsylvania and Ohio, in the sale of these hats; she has learned what is known in the trade as harvest hats; that her understanding is that a harvest hat must be cheap, retail at from 29 cents to $1; that, in her experience, the price and the demand vary with the crop; that if a worker secures 2 weeks' work, the hat does not have to be as durable as that used by a worker who would need the hat for a long period of time; that nearly all of the workers want something up to date and do not want to wear what their grandfathers used; that the style varies, depending upon the climate and the area in which they are being sold; that, in California, there is quite a variation in climate and the type of crop, which results in a demand for different sizes and shapes of harvest hats; that, in California, the season for the use of harvest hats is most of the year and that climate varies during the different seasons.

It becomes apparent from the record that all of the witnesses who were asked the question relative to the price category of harvest hats agree that they must be cheap and retail from between about 29 cents to 98 cents each. According to the testimony of the witnesses called on behalf of plaintiffs, the shape, block, style, brim, or crown measurements are not a determinative feature of harvest hats. On the other hand, the witnesses called on behalf of defendant agree that style, brim, and crown size, as well as decorations, which must be functional, are determining factors, in addition to the price, as to whether the imported article constitutes a harvest hat. By the same token, defendant's witnesses agree that a harvest hat of any shape or style, which exceeds the 98 cents retail price per hat, is excluded from being considered a harvest hat.

In the case of *Caradine Hat Co. et al.* v. *United States*, 9 Cust. Ct. 69, C.D. 664, certain hats in chief value of paper, having brim widths as narrow as $2\frac{1}{4}$ inches, were held, based upon the record, to be harvest hats. In that case, the court posed the issue as "Are the hats in question, irrespective of the width of the brim, known as harvest hats"? The court made the following observation that "no place in the above-quoted statutes is there any provision for hats with a certain width brim." It should be observed that the height of the crown is likewise

not provided for in the statute. In the course of the decision in the *Caradine* case; *supra*, the court made the following comment:

According to the evidence in this case two of the distinguishing features of a hat known as a harvest hat is coarseness of material and cheapness in price, and it is in effect agreed by all the witnesses who testified that an 8-bu hat is the coarsest and cheapest paper hat on the market.

Similarly, in the case at bar, the weight of the evidence with respect to price is that it must be cheap. In addition thereto, in the case at bar, it has been stipulated that the imported merchandise is under $3 per dozen, which is the value prescribed by the statute for harvest hats.

In the case of *International Hat Co. et al.* v. *United States*, 6 Cust. Ct. 164, C.D. 454, certain paper and chip hats which were not woven were held to be harvest hats, notwithstanding the fact that the Summary of Tariff Information indicated that straw hats are divided into two categories, i.e., sewed and woven, and that harvest hats fall within the latter category. The court therein held the woven category referred to in the Summary of Tariff Information related to straw hats and was not necessarily controlling with respect to nonstraw hats. The court also held that proof of commercial designation was not necessary, and the only burden the plaintiff had to meet in the case was that of establishing by competent evidence that the hats in question were known as harvest hats.

It is interesting to note, in the case at bar, the difference of opinion as to the characteristics of harvest hats. Also pertinent is the fact that plaintiffs' illustrative exhibits 15, 16, 17, 18, and 20 were considered by defendant's witnesses Pellegrino and Minkoff to be unblocked harvest hats and that defendant's witness Banstetter's firm actually makes harvest hats out of hat bodies such as plaintiffs' illustrative exhibits 15, 16, and 20. The testimony of Examiner Loera, who is well qualified not only by virtue of his experience with customs but also because of his prior commercial experience, was to the effect that, in the course of his official duties as an examiner at El Paso, he had advisorily classified items such as plaintiffs' illustrative exhibits 15 through 24 as harvest hats, either blocked or unblocked, depending upon the condition as imported. The testimony of witness Turner established that a number of the imported hats, which are blocked, were made from bodies which Examiner Loera testified he advisorily classified as harvest hats, unblocked, and which defendant's witnesses Pellegrino and Minkoff considered to be unblocked harvest hats. In addition, defendant's witness Banstetter's company actually made harvest hats from hat bodies, such as plaintiffs' illustrative exhibits 15, 16, and 20. Accordingly, it naturally follows that the weave and construction of at least the illustrative exhibits are of the class and kind, and durable enough to be considered harvest hats.

In the case of *Mexican American Hat Co.* v. *United States*, 67 Treas. Dec. 1146, Abstract 30251, the court held certain hats to be harvest hats, based upon the record and samples, and concluded that it did not feel it was wise to attempt to lay down a hard and fast definition as to what are and what are not harvest hats. We agree with this conclusion and it is obvious that our case must stand on its own record and samples.

The only prescription for harvest hats under the statute is the component material which is set forth and that they be under $3 per dozen and known as harvest hats. As to these factors, the involved hats fall within the purview of harvest hats. The evidence adduced by defendant as to the cost of welting or decoration in the United States is not such as would, in our opinion, remove the imported hats from the class of harvest hats, since they are obviously cheap hats which have been agreed to be valued at under $3 per dozen and durable enough in construction to be harvest hats. In addition, the cost of welting or decoration in Mexico was not known to these witnesses.

It is obvious, particularly to the writer of this opinion, who was born and raised on a farm in the beautiful Red River Valley of North Dakota, that a harvest hat must be one which will not only afford protection to the wearer against the sun, dust, and other elements, but, of equal importance, it must be a cheap hat.

A basic proposition in the field of customs jurisprudence is that a sample is a potent witness. *United States* v. *The Halle Bros. Co.*, 20 CCPA 219, T.D. 45995; *United States* v. *Butler Bros.*, 33 CCPA 22, C.A.D. 310; *A. Jaller Co.* v. *United States*, 37 Cust. Ct. 439, Abstract 60413; *United States* v. *Borgfeldt & Co.*, 13 Ct. Cust. Appls. 620, T.D. 41461; *Marshall Field & Co.* v. *United States*, 45 CCPA 72, C.A.D. 676.

An examination of the hats depicted by plaintiffs' exhibits 1 through 10 and 12–A through 14 clearly evidences the fact that they are substantially of the type used in the fields and around the farm. Accordingly, we are of the opinion that the imported hats are harvest hats, blocked, and, as such, dutiable under the provisions of paragraph 1504(b)(5) of the Tariff Act of 1930 at 25 per centum ad valorem, as claimed by plaintiffs herein.

The alternative claim of plaintiffs herein that a uniform practice exists which would require publication of notice of change in practice, pursuant to section 315(d) of the Tariff Act of 1930, as amended, has not been satisfactorily established. Accordingly, said claim is overruled.

To the extent indicated, the specified claim in these suits is sustained; in all other respects and as to all other merchandise, all the claims are overruled.

Judgment will be rendered accordingly.